### CANTRELL v. O'NEILL et al.

No. 14976—Opinion Filed Dec. 16, 1924.

Rehearing Denied April 14, 1925.

**1. Reformation of Instruments—Mistakes of Scrivener.**

Where an instrument, as reduced to writing by a scrivener, omits or contains terms or stipulations contrary to the common intention of the parties, the instrument will be corrected so as to make it conform to their real intent to the end that the parties be placed as they would have stood if the mistake had not occurred.

**2. Same—Intent of Parties—Sufficiency of Evidence.**

To justify the reformation of an instrument failing to conform to the agreement of the parties thereto, through a mutual mistake, the proof should be clear, unequivocal, and decisive. The proof must establish the facts to a moral certainty and take the case out of the range of reasonable controversy, but need not be so certain as to go beyond any possibility of controversy.

(Syllabus by Foster, C.)

Commissioners' Opinion, Division No. 5.

Error from District Court, Grady County; Will Linn, Judge.

Action by Alexander O'Neill, and W. W. O'Neill, Mary O'Neill and June O'Neill, minors, by their mother and next friend, Alexandria O'Neill, plaintiffs, against John Rutledge, Laura Rutledge, his wife, J. R. Driggers, J. W. Benge and Lily M. Benge, his wife, Joe F. Ball, and James W. Cantrell, defendants, for the reformation of a written instrument. Judgment for plaintiffs, and the defendant J. W. Cantrell appeals. Affirmed.

Wilkinson & Saye, for plaintiff in error.

Bond, Melton & Melton, for defendants in error.

Opinion by FOSTER, C. In this case, defendants in error, Alexandria O'Neill, W. W. O'Neill, and June O'Neill, minors, by their mother and next friend, Alexandria O'Neill, as plaintiffs, sued John Rutledge, Laura Rutledge, his wife, J. R. Driggers, J. W. Benge, and Lily M. Benge, his wife, Joe F. Ball, and James W. Cantrell, as defendants, in the district court of Grady county, Okla., to reform an instrument purporting to be an oil and gas mining lease, so as to make said instrument operate as an unconditional conveyance of one-half of the oil and gas in a tract of land located in Grady county, consisting of approximately 200 acres, which had been conveyed to the defendant John Rutledge by W. W. O'Neill, in his lifetime.

Judgment was rendered by the trial court in favor of the plaintiffs in accordance with the prayer of their petition, but only the defendant James W. Cantrell has appealed from the adverse judgment so rendered, said judgment having become final as to all the defendants except the said James W. Cantrell, who is the plaintiff in error in this court.

Parties will be hereinafter referred to as they appeared in the trial court.

It was the claim of plaintiffs in their petition that W. W. O'Neill, who was the husband of Alexandria O'Neill, and the father of W. W. O'Neill and June O'Neill, the plaintiffs, prior to his death in October, 1920,

executed a deed to the defendant John Rutledge, by which he conveyed about 200 acres of land in Grady county, and that as part and parcel of the same transaction by which the said land was conveyed and on the same date, it was intended that the grantee, Rutledge, should reconvey to W. W. O'Neill one-half of the oil and gas in the land, but that owing to a mutual mistake by the parties to the transaction, the instrument which the defendant Rutledge signed to evidence their agreement was an ordinary commercial oil and gas lease instead of an unconditional grant in fee of one-half the oil and gas in the land.

The petition prayed for the reformation of the instrument mentioned so as to make it operate as a conveyance of one-half of the oil and gas in the land.

Answers were filed by the various defendants in the case, but since the defendant Cantrell only has appealed, no attention need be paid to the answer of any defendants except Cantrell.

The defendant Cantrell denied generally the allegations contained in the plaintiffs' petition, and claimed to be a purchaser of 70 acres of the farm originally purchased by Rutledge from a subsequent grantee of Rutledge, and disclaimed all interest in the remainder.

Judgment having been rendered as stated, motion for a new trial was filed and overruled, exceptions allowed, and the cause comes on regularly to be heard in this court on appeal by the defendant Cantrell.

There is only one proposition argued and discussed by the defendant in his brief, as ground for reversal, and that is that the plaintiffs failed to introduce sufficient proof to warrant the trial court in rendering a decree changing the oil and gas lease into a conveyance.

There does not appear to be any conflict in the evidence upon the proposition that in the inception of the negotiations for the sale of the 200 acres of land, a reservation of the entire oil and gas rights in the land was proposed, this reservation to be accomplished by a separate grant thereof, by Rutledge to O'Neill, at the time the deed was executed. This is the testimony of T. J. O'Neill, the father of W. W. O'Neill, corroborated in all substantial respects by the testimony of W. G. Methvin, a witness for the defendant.

As the negotiations proceeded it appears that the original proposition was modified, and it is with reference to the nature and extent of the modified agreement that the principal conflict in the evidence developed. The testimony of witness T. J. O'Neill is clear and positive that on the day the deal was finally closed an agreement was reached in his office whereby W. W. O'Neill consented to accept a conveyance of one-half the oil and gas rights, and while he was not present when the instrument was drawn by which the agreement between them was evidenced, this was the purport of the agreement as they left his office for the office of Mr. Methvin, to have the instrument reduced to writing and signed.

The witness Methvin, who was engaged by O'Neill and Rutledge to draw the instrument in question did not give a very convincing statement of what transpired in his office when the instrument was drawn with respect to how it was that O'Neill came to relinquish his previous demand for a conveyance of the entire oil and gas rights and accept in lieu thereof an instrument which did not even secure to him the rights ordinarily obtained by a lessee in a commercial oil and gas lease. It must be remembered that Methvin was a layman and that the instrument was drawn by the parties without professional aid.

If the instrument which Methvin drew is to be accepted as reflecting the true intent of the parties, then O'Neill in assuming the payment to the lessor of a royalty of one-half of the oil and gas produced by him as lessee, shouldered a burden which no lessee could discharge without a prospect of substantial loss and cannot be regarded even as a surrender of his previous demand, much less a compromise thereof.

Methvin, when confronted with this stipulation appearing interlined in the instrument in his own handwriting, could account for it upon no other theory than that it was intended by the parties that they should share in the royalties equally up to a certain date, which intention tends to corroborate the theory of the plaintiffs that the parties intended to divide ownership in the oil and gas equally, and not merely to execute a commercial oil and gas lease on the entire land.

In view of this admission by the witness Methvin, coupled with the further admission that his recollection was not clear as to the material facts in connection with the transaction, we cannot regard the testimony of Methvin of a very convincing character upon the proposition that the instrument was intended as a commercial oil and gas lease.

When we come to consider the testimony of the defendant Rutledge himself it is equally unconvincing. It is true that Rut-

ledge denied the evidence of T. J. O'Neill to the effect that an agreement was reached in his office between W. W. O'Neill and Rutledge a short time before the instrument was drawn whereby O'Neill should obtain the ownership of one-half the oil and gas in the land, and denied that he had ever entered T. J. O'Neill's office prior to February, 1919, considerably more than a year after the instrument in controversy was executed.

It is not denied by Rutledge that about February, 1919, he went to the office of T. J. O'Neill in response to a written communication calling him there to settle and adjust some of the purchase money notes which he had executed and delivered to W. W. O'Neill for the farm in question.

There is a sharp and irreconcilable conflict between the testimony of T. J. O'Neill and Rutledge as to what transpired on this occasion. Both witnesses agree that an argument took place between them, but they differ widely over what the argument was about.

Rutledge testified that there was no dispute on this occasion over the proposition that W. W. O'Neill had a commercial oil and gas lease on the farm, but the dispute arose as to whether or not W. W. O'Neill had suffered this lease to lapse on account of nonpayment of rentals, Rutledge contending that he had, and O'Neill that he had not. On the other hand O'Neill testified that the dispute arose over the proposition as to whether or not W. W. O'Neill had reserved the entire oil and gas rights or only the one-half interest therein.

We are at a loss to understand why Rutledge should have gone to the office of O'Neill at all on the occasion mentioned, if it was a lease which W. W. O'Neill had taken and this lease had lapsed for nonpayment of rentals. If T. J. O'Neill, as testified to by Rutledge, was pressing Rutledge for the money due W. W. O'Neill upon his note, there could be no good purpose in going to the office of O'Neill and discussing with him the propriety of leasing the land for the purpose of obtaining money with which to pay the note. The obvious thing to have done in these circumstances would have been to have leased the land and then gone to the office of T. J. O'Neill and paid off the note with the money obtained from the lease.

On the other hand, if Rutledge thought he owned only a one-half interest in the oil and gas rights in the land and needed the money to be obtained from the leasing of such interest to pay the note on which he claims he was being pressed by T. J. O'Neill, as an agent of W. W. O'Neill, it was per-

fectly natural for him to go to O'Neill and open negotiations for a joint lease of the 200 acres of land in controversy. When it is remembered, in order to settle the dispute, that O'Neill went and examined the record the following day and wrote Rutledge a letter confirming O'Neill's version of the dispute which was not replied to by Rutledge although its receipt was admitted by him, and that Rutledge thereupon immediately set about leasing the entire land on his own account and did lease it, and in view of the further fact as disclosed by the record that Rutledge claimed all the time in his testimony to be entitled to the entire rental money, although he conceded that O'Neill might have an interest in the royalty, we cannot regard his testimony as possessing that degree of weight as to raise in the mind of the court a rational doubt of the fact that the instrument in question was intended as a grant of one-half the oil and gas on the land.

We are not able to say, under the rule announced by the authorities, that the trial court was not justified in finding to a moral certainty, and beyond a reasonable doubt that the instrument in controversy was intended to operate as unqualified conveyance of one-half the oil and gas in the land, or that plaintiffs have not made clear and decisive proof of a mutual mistake in the execution of the instrument in controversy, sufficient to justify its reformation.

It is true that there was some conflict in the evidence, yet it is difficult to say upon a thorough examination of the entire record that this conflict was of such nature as to justify the court in saying that plaintiffs have not established their case beyond reasonable controversy.

In the case of Davidson et al. v. Bailey et al., 53 Okla. 91, 155 Pac. 511, it is said:

"It is contended by counsel for plaintiffs in error that, there being a conflict in the testimony of plaintiffs and defendants, that the court could not say, under the principle announced in the former opinions of this court, there was a clear, unequivocal and decisive proof of a mutual mistake. We cannot agree with this position, for clear, unequivocal, and decisive evidence does not mean that such evidence may not be controverted or denied. It is sufficient as said in Hope v. Bourland, supra, that the mistake be shown so as to leave no 'rational doubt of the fact.'"

The court continues, quoting from Cleveland v. Rankin, 48 Okla. 99, 149 Pac. 1131, with approval:

"Proof establishing a fact so thoroughly as to take it out of the range of controversy

must necessarily be of an exceedingly high order. In fact, such proof could rarely, if ever, be produced. There are cases, however, where the proof could be made so clear and decisive as to establish the fact to a moral certainty, and to leave no room for a reasonable doubt in the minds of men of ordinary intelligence. * * *"

In Cleveland v. Rankin, the case was reversed because of an instruction which told the jury that the evidence of mutual mistake must be so full and clear as to leave no room for controversy.

From an examination of the entire record we are convinced that the plaintiffs met the degree of proof required of them in cases of this kind, and that the judgment of the trial court is clearly supported by the evidence in the case. It follows that the judgment of the trial court should be and is hereby affirmed.

By the Court: It is so ordered.